# STATE EX REL. SIVER H. HELLING AND OTHERS v. INDEPENDENT CONSOLIDATED SCHOOL DISTRICT NO. 160, BROWN COUNTY, AND OTHERS.

92 N. W. (2d) 70.

July 25, 1958—No. 37,472.

*Blethen, Ogle & Gage* and *Henry N. Somsen, Jr.,* for appellants.
*C. Allen Dosland* and *Gislason, Reim & Minium,* for respondents.

KNUTSON, JUSTICE.

This is an appeal from an order denying relators' motion for a new trial in a quo warranto proceeding brought to test the validity of the reorganization of school districts. Relators are legal voters and freeholders in Brown County, in this state.

A school survey committee was organized in Brown County pursuant to M. S. A. 1953, § 122.41. After a study of school conditions in that county, the committee made its final report on or about November 1, 1948, which included a proposal to consolidate Independent School District No. 81 of Hanska with Common School Districts Nos. 7, 20, 37, 38, 53, 54, 31, 67, 75 and Watonwan County District No. 49 attached in Brown County and S½ SE¼ NW¼; S½ SW¼

NE¼; lot 2 and NW¼ SE¼; S½ SE¼ NE¼; 2 acres of N½ SE¼ NE¼; lot 3 and E½ SE¼, sec. 13, T. 108, R. 32; and lot 1, sec. 24, T. 108, R. 32.

Objections were later made by residents of Districts Nos. 20 and 37, since the children from these districts, for the most part, had attended high school in Madelia, so on September 15, 1953, the committee amended its report by excluding those two school districts. The proposal as so amended was submitted to the voters on March 15, 1954. It was approved by the urban vote 193 to 11 but rejected by the rural vote 193 to 242. With permission of the State Board of Education, it was again submitted to the voters on August 24, 1954, and again approved by the urban voters 147 to 12 but rejected by the rural voters 154 to 238. Proceedings subsequent to these two elections give rise to the matter now before us.

On April 6, 1955, an order was issued by the county superintendent of schools of Watonwan County consolidating that portion of Watonwan County District No. 49 attached in Brown County described above, together with Districts Nos. 20 and 37 which had been eliminated from the proposed consolidation by the committee, into Joint Independent Consolidated School District No. 158, Watonwan, Blue Earth, and Brown Counties, which may be referred to as the Madelia district.

A portion of Common School District No. 7, Brown County, had been served by the Madelia high school for at least 15 years. Following the second election of the proposed Hanska reorganization, residents of District No. 7 petitioned the county commissioners of Brown County to have their land set off from District No. 7 into the Madelia district. At a hearing on that petition, proponents of the Hanska reorganization appeared in opposition, and on February 7, 1956, the Brown County commissioners denied the petition. Thereafter on July 24, 1956, a petition for consolidation of District No. 7 with the Madelia district was filed with the county superintendent of schools of Watonwan County. A plat of the proposed consolidation was approved by the Department of Education, and an election was held thereon on August 10, 1956. The proposed consolidation was defeated by a vote of 29 to 25, with several spoiled ballots. Thereafter a petition for consolidation of a portion of District No. 7 was circulated. A plat of

this proposed consolidation was submitted to the State Board of Education for approval on September 17, 1956. The plat was approved by the Department of Education on December 7, 1956, and the commissioner of education on that date transmitted to the superintendent of schools of Watonwan County a letter instructing her that she might now receive the petition from the resident freeholders of that portion of District No. 7 included in this proposed consolidation and, upon receipt thereof, call an election for consolidation. Because of some delay in transmittal, the county superintendent of schools received this letter on December 11, and she promptly signed a notice of election on that date setting the election for December 28, 1956. The notice was published in the Madelia Times Messenger. Upon the election, the proposed consolidation carried by a vote of 18 to 1, and on December 28, 1956, the county superintendent of schools entered an order of consolidation of these districts.

In the meantime, efforts had been carried on by proponents of the so-called Hanska reorganization. They had appeared before the county survey committee requesting a third election. The county survey committee granted permission, with the understanding that the date would be set later after consultation with and approval of the Department of Education and depending also upon the outcome of the petition of District No. 7 to be set off into the Madelia district, one of which petitions was then pending before the county commissioners of Brown County. On February 14, 1956, the superintendent of schools of Brown County wrote the State Advisory Commission requesting permission to hold another election for the proposed Hanska reorganization. The commissioner of education wrote the county superintendent that, because of the limited enrollment and the insufficient assessed valuation, it was desirable that some more territory be added to the proposed consolidation. The county survey committee met on May 29, 1956, to consider the possibility of enlarging the proposed reorganization and came to the conclusion that it was not feasible. The survey committee instructed the county superintendent to request the State Advisory Commission to force District No. 7 to vote upon the proposed consolidation with the Madelia district as soon as possible and to ask the State Advisory Commission to approve a date for the third election upon the Hanska proposal. On June 4, 1956, the county superintendent of schools of Brown County

wrote the commissioner of education regarding the matter and requested that a hearing be arranged on the matter. Thereafter on June 8, the Department of Education advised the county superintendent that a hearing would be arranged. Such hearing was held on July 10, 1956, and on October 9, 1956, the State Advisory Commission recommended to the State Board of Education that the request for a third election on the Hanska reorganization be denied. Such denial followed.

Thereafter, the interested parties in Brown County procured an opinion from the attorney general's office in which they were advised that the permission of the State Advisory Commission was not necessary in order to hold another election. Thereupon the Brown County school survey committee met on December 5, 1956, and arranged an election upon the proposal to consolidate the same districts as were included in the first two elections with the exception of that part of Watonwan County District No. 49 attached to Brown County, which had theretofore been consolidated with the Madelia district. Information regarding this election was published in the New Ulm Daily Journal on December 6, 1956. On December 8, 1956, the county attorney of Brown County received an opinion from the attorney general, which opinion was immediately given to the county superintendent of schools, in which the attorney general reached the conclusion that it was the duty of the county superintendent to call the third election. On Saturday, December 8, 1956, the county superintendent of schools of Brown County received a copy of a letter written by the commissioner of education to the county superintendent of schools of Watonwan County approving the plat of the proposed consolidation of a portion of Common School District No. 7 with the Madelia district and advising her that she could set a date for election on the proposed consolidation. On the same date, December 8, 1956, the county superintendent of schools of Brown County contacted as many members of the Brown County school survey committee as she could reach by telephone requesting approval to change the date of election upon the Hanska reorganization from December 28 to December 20. The reason for this change, later published, announced that it was undesirable to hold the election during the Christmas and New Year holidays. On December 8, Helen

Schroeder, the county superintendent of schools of Brown County, signed a notice of election, which was published in the New Ulm Daily Journal on December 10, 1956. The New Ulm Daily Journal is a daily newspaper published in New Ulm and qualified to publish legal notices. It is circulated in the territory embraced by the proposed Hanska reorganization, but it is not printed or published therein. The Hanska Herald, a weekly newspaper published on Thursday at Hanska, is also qualified to publish legal notices and is circulated within the territory embraced by the proposed reorganization. No legal notice of election was published in the Hanska Herald.

At the election held on December 20, 1956, the proposed Hanska reorganization carried. The urban vote was 236 to 5 in favor; the rural vote was 290 to 174 in favor of the reorganization. On December 21, 1956, the county superintendent of schools of Brown County issued an order purporting to establish the reorganized district.

In the districts proposed to be reorganized in the final election held on December 20, 1956, there was a total of 779 eligible voters. Of these, 705 voted at the election. Preliminary to making the request for the third election, a petition was circulated among the districts involved in the reorganization asking that the question of reorganization again be submitted to the voters. In the rural districts, 335 out of a total of 502 qualified voters requested a new election. 268 out of 277 eligible voters in the urban area requested such election. In the election held on December 20, 1956, 57 votes were cast from District No. 7. Of these, 31 were in favor of the proposed reorganization and 26 were against. There were 62 qualified voters in District No. 7.

On February 20, 1957, members of a school board were elected and qualified as members of the board of education of Independent Consolidated School District No. 160 of Brown County, the name given the reorganized Hanska district. On March 1, 1957, the school board met to organize and elect officers. Thereafter it has functioned as a school board, entering into contracts with teachers and a superintendent, and other business has been transacted. On May 21, 1957, the annual school election of Independent Consolidated School District No. 160 was held and members of the board of education elected. Thereafter, special meetings were held, and this board interviewed firms of archi-

tects preliminary to making school improvements. Eight elementary teachers were hired for the school year 1957-1958, which was four more elementary teachers than the old Independent School District No. 81 had employed. All of the common school districts which were reorganized into the new district have disbanded and have been advised by the county superintendent of schools to close their books and turn over their assets to the new school district. No new school district officers have been elected in the old districts, nor have any taxes been levied for the maintenance of the schools for the year following the reorganization. The county assessor's office of Brown County has changed its books so as to show inhabitants of the new district as living in District No. 160 rather than in the old common school districts and Independent School District No. 81. The county superintendent of schools of Brown County has made no plan to secure teachers for the rural schools which were reorganized into the new district, nor have any supplies been ordered for the operation of these schools.

The petition for leave to file an information for a writ of quo warranto was dated May 27, 1957. The information and order granting leave to file the same are dated on the same date, and the order for a writ of quo warranto and the writ are likewise dated May 27, 1957.

After a consideration of the matter upon a stipulation of facts, the trial court made its findings of fact, conclusions of law, and order for judgment sustaining the validity of the reorganization and quashing the writ of quo warranto. Alternative motions for amended findings of fact, conclusions of law, and order for judgment or for a new trial were denied, and this appeal followed.

The questions presented for our determination are: (1) Was failure to publish the notice of election in the Hanska Herald a jurisdictional defect? (2) Was the notice of election sufficiently definite to apprise the voters of the territory involved in the reorganization and the place where the balloting was to be conducted? (3) May the court determine whether a reorganization was for the best interests of the territory affected in a quo warranto proceeding? (4) Was the approval of the State Advisory Commission necessary in order to hold this election? (5) Did the proceedings for the consolidation of a part of District No. 7 with the Madelia district take precedence over the Hanska reorganiza-

tion? (6) Were relators guilty of laches?

■ It is the contention of relators that publication of the notice in the Hanska Herald was a jurisdictional prerequisite to a valid election. M. S. A. 122.52, subd. 1,[1] as far as material, reads:

"* * * A notice of election shall be given, the question submitted, the election held and the vote canvassed and reported in accordance with the provisions of Minnesota Statutes, Section 122.21, for the submission of a similiar or like proposal * * *."

Section 122.21, subd. 1, as far as material here, reads:

"* * * such notice shall be published once, at least ten days prior to the date of such meeting or election, in a newspaper, whether it be a legal newspaper or not, if there be one published in said proposed consolidated school district, * * *."

The Hanska Herald is published in the proposed school district. The plain language of this statutory provision requires publication of the notice in the Hanska Herald.[2]

At the outset, we wish to say that it is difficult for us to understand why public officials chargeable with the duty of proceeding according to law, and their legal advisors, choose to ignore the plain requirement of a statute. There is nothing ambiguous about this provision. It should have been a simple matter to follow it. Relators contend that it was not followed for the reason that someone wanted to hold the election on the reorganization before the election could be held on the consolidation of a part of District No. 7 with the Madelia district. The obvious intentional disregard of this plain statutory requirement gives much support to this contention. Respondents' explanation is that it was undesirable to hold an election during the Christmas holidays, but no reason has been advanced why it could not have been held after the holidays. It should also be noted that the election on the consolidation of

---

[1] Statutory references herein are to M. S. A. 1953 as amended. The statutory provisions referred to herein have been largely superseded by L. 1957, c. 947.

[2] State ex rel. School Dist. No. 56 v. Schmiesing, 243 Minn. 11, 66 N. W. (2d) 20.

District No. 7 with the Madelia district was held during the Christmas holidays. However, courts are reluctant to hold invalid elections even though statutory proceedings have not been followed, unless it clearly appears that they were jurisdictional requirements, where the results show that there has been a free and fair expression of the voters. In In re Order of Sammons, County Superintendent of Schools, 242 Minn. 345, 349, 65 N. W. (2d) 198, 202, we said:

"It is the general rule that, *before an election is held,* statutory provisions regulating the conduct of the election will usually be treated as mandatory and their observance may be insisted upon and enforced. *After an election has been held,* the statutory regulations are generally construed as directory and such rule of construction is in accord with the policy of this state, which from its beginning has been that, in the absence of fraud or bad faith or constitutional violation, an election which has resulted in a fair and free expression of the will of the legal voters upon the merits will not be invalidated because of a departure from the statutory regulations governing the conduct of the election except in those cases where the legislature has clearly and unequivocally expressed an intent that a specific statutory provision is an essential jurisdictional prerequisite and that a departure therefrom shall have the drastic consequence of invalidity."

The application of the above rule is particularly apropos where it appears that failure to comply with a statutory requirement could not have affected the result of the election. Here, there were 779 eligible voters. Of these, 502 were in the rural areas and 277 in the urban area. 464 of the 502 voters in the rural area voted at the election; 38 did not vote; 290 voted in favor and 174 against the reorganization; hence it carried in the rural area by 116 votes. In the urban area, 241 of the 277 eligible voters cast their votes. Of these, 236 were in favor and 5 against; 36 eligible voters did not vote; consequently the proposition carried in the urban area by 231 votes. Even if all 38 rural voters and all 36 urban voters who failed to vote had cast their votes against the proposition, it still would have carried. In view of this fact, we hold that failure to publish the notice in the Hanska Herald could not possibly have affected the results of the election. While that fact does not excuse

willful failure to follow the statute, under the circumstances of this case we are inclined to hold that it was not such an irregularity as would vitiate the election. While so doing, we wish to caution those chargeable with the conduct of such elections that in other cases, where it does not so clearly appear that failure to follow the statute has not affected the outcome, a deliberate failure to follow a statutory requirement as clear as this one may well be fatal. Where the meaning of the statute is unambiguous, there is no excuse for ignoring it.

■ Was the notice sufficiently clear to apprise the voters of the territory involved in the reorganization and the place where the balloting was to be conducted? The notice read as follows:

"Notice is hereby given that a special election in school districts Nos. 7, 38, 53, 54, 31, 67, 75, and 81 in Brown County, Minnesota, will be held at school house on the 20th day of December 1956, from 1:00 o'clock p. m. to 4:00 o'clock p. m., for the following purposes: Shall school districts Nos. 7, 38, 53, 54, 31, 67, 75, 81 and part of District 28 be merged to form one district as set forth in the final report of the Brown County Survey Committee?"

The argument is that, inasmuch as the territory is inaccurately described and the place of election is "held at school house," the voters could not know where the voting would take place.

What we have said above with respect to publication of the notice applies equally to the designation of the place of voting. So large a proportion of eligible voters actually cast their votes that it can hardly be said that they were misled as to the place of voting. Even if a few were misled, it could not have changed the result, for, as we have shown above, even if all eligible voters who did not vote had cast their votes against the proposition, the result would have been the same.

With respect to the area to be included in the reorganized district, the objection is that the portion of the notice which reads "part of District 28" was incorrect. While this description is not as complete as it might have been, we are convinced that the voters were well aware of the area to be included. This was the third election held. The area was the same as that previously rejected, with the exception of that part of Watonwan County District No. 49 attached in Brown County

which, prior to the third election, had been consolidated with the Madelia district. The notice states that the reorganized district is to be formed "as set forth in the final report of the Brown County Survey Committee." This report describes the area in District No. 28 which is to be included. Under these circumstances, we are of the opinion that the notice was not so inaccurate as to invalidate the election.

■ It is the contention of relators that under § 122.52 the approval of the State Advisory Commission was essential to the holding of a valid third election. Section 122.52, subd. 1, undoubtedly deals with the holding of the first election after the filing of a final report by a county survey committee. As far as material it reads:

"In the event the final report of any committee recommends the reorganization of school districts, then the question of reorganizing such school districts, as recommended by the committee, shall be submitted to the legal voters residing in the proposed district only, at an election to be called by the county superintendent of the county in which such district or territory, or the major portion thereof is located, within twelve months after the filing of the final report, unless a later date has been approved by the state board of education."

Section 122.52, subd. 3, reads:

"In case an election for reorganization has been held in accordance with the provisions of sections 122.40 to 122.57, and such election has failed, another election in any proposed district may be held at which time the same recommendation or a revised recommendation, approved by the state advisory commission, shall be submitted to the voters. Such election when recommended by the county survey committee shall be called by the county superintendent and conducted in accordance with the provisions of this section."

The legislative history of these provisions is helpful in determining what was the legislative intent.

The original school district reorganization act (L. 1947, c. 421) provided that an election on a reorganization recommended by a county school survey committee must be held within 9 months after the final report of the committee was filed. § 13. There were no provisions for

subsequent elections if the first election failed to carry. This section was amended by L. 1949, c. 666, § 8, and in that amendment the original election was required to be held prior to April 1, 1953. The amendment added paragraph (3), providing for subsequent elections in case the first failed to carry. Paragraph (3) as contained in that act reads as follows:

"In case an election for reorganization has been held in accordance with the provisions of this act, and such election has failed, the county superintendent, *with the approval of the county survey committee,* may call another election in any proposed district at which time the same recommendation or a revised recommendation, approved by the state advisory commission, shall be submitted to the voters. Such election shall be conducted in accordance with the provisions of this act." (Italics supplied.)

In 1951 there were two amendments. L. 1951, c. 305, amended part of the reorganization act but left § 122.52, subd. 3, without change. This act was approved on April 7, 1951. The same legislature adopted c. 706. The heading of subd. 3 was changed from "Failure of election" to "Calling another election." Otherwise the subdivision remained the same.

It was again amended by L. 1953, c. 744, § 8, making subd. 3 read as follows:

"In case an election for reorganization has been held in accordance with the provisions of sections 122.40 to 122.57, and such election has failed, another election in any proposed district may be held at which time the same recommendation or a revised recommendation, approved by the state advisory commission, shall be submitted to the voters. Such election when recommended by the county survey committee shall be called by the county superintendent and conducted in accordance with the provisions of this section."

It is this later provision which governs in this case.

The 1953 amendment (L. 1953, c. 744, § 8) also amended subd. 1 by adding the words, with respect to the time within which the election could be called, "within twelve months after the filing of the final

report, unless a later date has been approved by the state board of education."

It seems evident from the legislative history of these provisions that § 122.52, subd. 1, in so far as it relates to the calling of an election, deals only with the first election called after the county survey committee has filed its final report and that, under that provision as amended by L. 1953, c. 744, if such election is called more than 12 months after the committee's final report, such later date must be approved by the State Board of Education.

■   It seems equally evident to us that any subsequent election called after an unsuccessful first election must have the approval of the State Advisory Commission. Respondents contend that such approval is required only before a subsequent election can be called on a revised recommendation. The words "the same recommendation" and "a revised recommendation" are separated by the disjunctive "or." If the words "approved by the state advisory commission" were intended to relate only to a revised recommendation, the two provisions no doubt would have been separated by a comma or some other appropriate word or symbol and would not have been included in the same clause. It seems to us from the history of these statutory provisions that the legislature intended to vest in the State Board of Education some measure of control over an election held after the lapse of more than 12 months after the filing of the final report and likewise intended to vest in the State Advisory Commission a measure of control over all subsequent elections.

Here, the election not only was held without the approval of the State Advisory Commission but it was held in the face of a denial of such approval. Apparently it was held as the result of an opinion of the attorney general that such approval was not required unless there was a revision in the original recommendations. The opinion was based on our decision in State ex rel. Klitzke v. Independent Consol. School Dist. No. 88, 240 Minn. 335, 61 N. W. (2d) 410.

The question involved here was not presented in the above case. The stipulation of facts upon which our decision in that case is based admits that a fourth election "was duly held," and the principal question was

whether more than two elections could be held under § 122.52. We said (240 Minn. 347, 61 N. W. [2d] 417):

"We do not question that the requirements of the statute as to proceedings in elections are mandatory and that there must be substantial compliance, but we cannot here disregard another rule to the effect that an irregularity not apparently affecting the result will not be permitted to avoid a fair election."

While there are some statements in our opinion in the above case from which it might appear that we held that the approval of the State Advisory Commission was not necessary unless the election was based on a revised recommendation, in view of the stipulated facts upon which the decision is based, it is apparent that we never reached that question. We did hold that the change in area in that case was so inconsequential as not to amount to a revision. In that regard we said (240 Minn. 347, 61 N. W. [2d] 418):

"We are of the opinion that deletion of School District No. 86 from the petitions used, the notices of elections, and the election ballot was not such a change or revision of the school survey report as required formal revision and approval by the state advisory commission and that the approval of the county survey committee was sufficient under the existing circumstances."

In the case now before us there not only was a lack of substantial compliance with the statute but it appears that there must have been a deliberate design to ignore the statute.

■ Aside from the question of whether approval of the State Advisory Commission is necessary where there is no revision, we think that the proposal which finally carried was a substantial deviation from the original recommendation of the county survey committee. 560 acres of land were eliminated when that part of District No. 49 included in the original recommendation was consolidated with the Madelia district and thereby eliminated from this proposed reorganization. The area included in the proposed reorganization by the county survey committee presented, at the best, a marginal case. The state authorities were of the opinion that it was too small. The elimination of 560 acres of land

from a larger proposed district might not be fatal, but here, where we are dealing with a proposed district that was on the borderline in the first place, elimination of that much land can hardly be held to present the same proposition to the voters as had been presented by the original recommendation of the county committee. The state authorities were of the opinion that it was a revised recommendation. We think that it must be held that the third election was submitted on a proposition which constituted a substantial deviation from the original recommendation. As such, the approval of the State Advisory Commission was necessary under the statute before such election could be held, and, inasmuch as such recommendation not only was not procured but was expressly denied, it cannot be held that the election was a valid one.

Even if it could be held that the third election was on the same recommendation as the first and that the approval of the State Advisory Commission was not necessary before holding a subsequent election on such "same recommendation," this proceeding must fail. Under those circumstances, the priority of this proceeding and the consolidation proceeding under which it was sought to consolidate a part of District No. 7 with the Madelia district would arise.

In State ex rel. Harrier v. Village of Spring Lake Park, 245 Minn. 302, 71 N. W. (2d) 812, we held that, where two municipal authorities seek to exercise jurisdiction over the same territory, exclusive jurisdiction vests in the one first acting validly under the power granted. In applying this rule in State ex rel. Village of Orono v. Village of Long Lake, 247 Minn. 264, 270, 77 N. W. (2d) 46, 50, we said:

"* * * the municipal authority which first institutes valid proceedings under the power granted by the statutes has the exclusive jurisdiction over the area in question."

We quoted with approval the following from In re Incorporation of Village of St. Francis, 208 Wis. 431, 433, 243 N. W. 315, 316 (247 Minn. 271, 77 N. W. [2d] 51):

"* * * If those who are attempting to direct the course of the two movements have in each instance met the statutory requirements in notice, application, survey, and other details of the proceedings required by law, the movement first started has the right of way."

This rule has equal application in connection with the organization or change of school district boundaries.[3]

Under our statutes we have several methods whereby the area of one school district may be annexed to or consolidated with another. Frequently there is a lack of unanimity among the residents of a school district as to what method should be pursued and what, if any, change should be made. As in this case, sometimes one group of residents tries to outsmart or beat another to the accomplishment of a change which is favored. In order to avoid utter chaos, some rule of priority must exist. In adopting the rule we have applied in municipal affairs, one proceeding may be permitted to proceed to completion before another can be commenced.

In the above cases we applied the rule that jurisdiction vests when the first "public procedural step" is taken. The Michigan case of Birmingham School Dist. v. School Dist. No. 2, 318 Mich. 363, 371, 28 N. W. (2d) 265, 268, relied upon by relators, uses the term "first necessary statutory step." We see little difference in the use of the two terms. We think that the determinative question here is: What is the first statutory procedural step required in order to vest jurisdiction in one group or the other?

Under our so-called reorganization act (M. S. A. 1953, § 122.40, et seq.) the procedure for holding elections is found in § 122.52. Under that section, the first statutory procedural step for the first election after the filing of the final report of the county survey committee is to be found in subd. 2 and is the fixing of a date for an election by the county superintendent of schools. All action taken prior thereto, including the survey and recommendation of the county survey committee, hearings which must be held in the area affected, and matters of that kind, is

---

[3]See Birmingham School Dist. v. School Dist. No. 2, 318 Mich. 363, 371, 28 N. W. (2d) 265, 268, where the Michigan court said:

"We consider that the controlling question in this case is, which district took the first necessary statutory step toward annexation. Both parties to the appeal agree that in a conflict of annexations, the taking of the first necessary statutory step establishes jurisdiction and priority. This principle of law is well settled in many jurisdictions. [Citing cases.] These cases involved municipalities. The same principle is applied to school districts."

preliminary to a determination of whether an election should be held. These recommendations and proceedings establish no legal rights but are entirely preliminary to the first act which really puts in motion the machinery for holding an election. In State ex rel. Klitzke v. Independent Consol. School Dist. No. 88, 240 Minn. 335, 346, 61 N. W. (2d) 410, 417, we said:

"Neither the survey committee nor the state advisory commission have any authority to establish legal rights. They have the power to study and consider reorganizations of school districts for purposes of recommending the adoption of a plan to be submitted to the voters, but neither has the power to create a school district."

In some of our proceedings for consolidation of schools a petition is required. No such petitions are required in the reorganization proceedings. The first definite action which must be taken before an election can be held is the act of the county superintendent fixing a date for the election. We think that should be held to be the first statutory procedural step in proceedings of this kind as to the first election.

After the first election has been held and has failed to carry, the procedure for holding a subsequent election is found in § 122.52, subd. 3. We need not determine what is the first procedural step for holding a subsequent election on a revised recommendation because, if this was a revised recommendation, the required approval of the State Advisory Commission was never obtained and it must follow that the election was improperly held. If, on the other hand, we hold that the third election was on the same recommendation as the first and that the approval of the State Advisory Commission is not required before holding such election, then the first statutory procedural step would be the calling of the election by the county superintendent of schools after such election was recommended by the county survey committee.

The first statutory procedural step in the consolidation proceeding under §§ 122.18 to 122.22 is the filing of a plat with the state commissioner of education for approval.[4] Formal action to hold the third elec-

---

[4]The statutory proceedings involved in this case have been largely superseded by the passage of L. 1957, c. 947. As codified, M. S. A. 122.018 deals with consolidation proceedings. Subd. 5 thereof reads as follows:

tion on the reorganization proposal on the theory that the approval of the State Advisory Commission was unnecessary was not taken until December 5, 1956. The plat under the proposed consolidation proceeding was filed with the commissioner of education for approval on September 17, 1956; hence it was entitled to priority until it had been voted up or down or approval of the state commissioner of education had been denied. The required approval was forthcoming and the election on that proposal carried; hence the area involved in the consolidation was effectively removed from the reorganization proposal the same as the area included in District No. 49 had theretofore been removed by a prior proceeding of a similar kind.

While we have been reluctant to hold invalid a school reorganization where the residents of the district have voted in favor of it, there has been such a complete disregard of applicable statutes in this case that we have no choice but to hold that the school district has not been established according to law. In Cory v. King, 209 Minn. 431, 435, 296 N. W. 506, 508, we said:

"We refuse to sanction disobedience of a statute, whether it be by way of direct attempt or evasion by erroneous construction."

Here it is clear that there has been little effort to follow the statutes. Probably the end attained is a desirable one, but the methods used should not have judicial approval.

Finally, respondents claim that the decision should be upheld because relators have been guilty of laches. It is argued that, in view of the fact that the new district has now functioned for some time, chaos will follow if we hold the district invalid. There is no basis for a holding of laches. Respondents have known from the beginning that relators intended to challenge the validity of the reorganization pro-

---

"Upon receipt of a plat and the supporting statement, each auditor shall immediately notify his respective county board. After such notification, and during the pendency of proceedings under the plat and supporting statement or for a period of six months, whichever is shorter, no action may be taken by the county board under any other law to modify the boundary of any district if any part of the district is included in an area proposed for consolidation."

ceeding. No undue delay has occurred in commencing these proceedings. While it is unfortunate that we should feel compelled to hold this reorganization invalid, the fault lies not with relators but must rest on the shoulders of those who failed to proceed according to law. It might be said in passing that the validity of acts done by the school board purporting to act as such can in all probability be sustained on the theory that they acted as a de facto board, assuming that they have acted in good faith. Beyond that, we cannot permit the consequences of our decision to affect our judgment to the extent that we fail to apply the law, no matter how distasteful to us the result sometimes is.

We feel that under the facts of this case we are compelled to reverse.

Reversed.

UPON APPEAL FROM CLERK'S TAXATION OF COSTS.

On September 12, 1958, the following opinion was filed:

PER CURIAM.

After appellants prevailed on this appeal, costs and disbursements were taxed and allowed against respondents in this court. This is an appeal from such allowance.

This action was a quo warranto proceeding brought to test the validity of the formation of Independent Consolidated School District No. 160, Brown County, Minnesota. The school district was named as a party, together with the acting superintendent and the members of the board of education of this school district. All the individual respondents are officers of the alleged school district and were purporting to act as such in their official capacity. They were not essential to the action, since the question involved was whether the school district was properly organized.

The question of allowance of costs and disbursements in this court is controlled by our decision in Schweigert v. Abbott, 122 Minn. 383, 142 N. W. 723, 928. In that case much the same situation prevailed as here, except that the case involved an appeal rather than a quo warranto proceeding. After a holding by this court that the school district was invalidly created, costs and disbursements were taxed against the county superintendent of schools, and he appealed. In

holding that he was not liable for such costs and disbursements, we said (122 Minn. 392, 142 N. W. 928):

"* * * It is doubtful whether he [the county superintendent of schools] is properly a party to the proceedings subsequent to making the final order of consolidation. * * * His only authority in the consolidation proceedings is in a representative capacity, acting for the state, discharging duties imposed by law, and, if a proper party to an appeal, involuntarily so, and the case comes within the general rule that, in the absence of express statute to the contrary, public officials acting in such capacity and performing duties expressly imposed by law are not personally liable for costs and disbursements."

While there may be some merit to the argument that, inasmuch as the school district was held to be improperly organized, the officers never were or became public officials, they were acting at least as de facto officials performing official duties and are no more liable for costs and disbursements in a proceeding of this kind than was the county superintendent of schools in the above case. The taxation of costs and disbursements must therefore be disallowed.